**Affirmed and Opinion Filed August 5, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01506-CR

**THERON WAYNE JOHNSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 380-82005-2011**

## OPINION

Before Justices Moseley, Francis, and Lang
Opinion by Justice Lang

Theron Wayne Johnson appeals the trial court's judgment convicting him of criminally negligent homicide. The jury found Johnson guilty, that he used a deadly weapon during the commission of the offense, and assessed his punishment at five and a half years of imprisonment. Johnson raises three issues on appeal: (1) the evidence is insufficient to support his conviction; (2) the evidence is insufficient to support the finding that he used or exhibited a deadly weapon during the commission of the offense; and (3) the trial court erred when it included a special issue on the use of a deadly weapon in the jury charge.

We conclude the evidence is sufficient to support Johnson's conviction and the deadly weapon finding. Also, we conclude no error resulted from the special issue on the use of a deadly weapon in the jury charge. The trial court's judgment is affirmed.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

In January 2011, Adana Craft, nicknamed "Dodie," began a relationship with Johnson. They had known each other for a few years before starting their relationship.  Eventually, Johnson began living with Craft in a house located on her rural acreage primarily used to graze cattle.  According to Johnson, he and Craft had a "very rocky relationship," Craft was always afraid that he would leave her, and she was "angry at the world."  Also, Johnson drank vodka "all day, every day," and he and Craft "drank [alcohol] every night."

In early May 2011, Johnson visited his dying aunt, Judy Ann Barlett, and brought Craft with him.  David Barlett, Johnson's cousin, observed that Craft appeared to be intoxicated and on drugs and she was very disrespectful, loud, and belligerent.  Johnson tried to settle Craft down, but was unsuccessful.  After Johnson and Craft left, David Bartlett did not have contact with Johnson for a few days.

On May 19, 2011, at 4:30 a.m., Johnson called Kathryn Green, Johnson's ex-girlfriend, and told her "he didn't know what to do."  In the background, during the phone call with Johnson, Green could hear Craft screaming, yelling, and throwing things.  Green believed that Johnson and Craft were intoxicated and arguing.  When Johnson asked Green "What should I do, she won't stop," Green said the phone went dead.  When Green called back, Craft answered the phone.  Craft used foul language, argued with Green, and refused to give Johnson the phone, so Green hung up.

At approximately 6:13 a.m., Johnson and Craft called Green using the speaker phone to apologize.  Although Green did not feel that Craft's apology was genuine, Green said that she accepted it and hung up the phone.

According to David Bartlett, at approximately 6:58 a.m., Johnson called crying and told him, "I love you Cuz.  I'm sorry if I ever did anything to hurt you, I just killed Dodie."  Then,

according to David Bartlett, "the phone went dead." David Bartlett was unable to call Johnson back.

At approximately 7:43 a.m., Johnson called Green again, crying and moaning. He told Green that Craft had hanged herself and was dead. When Green told Johnson to call the police, Johnson responded "You don't understand. This doesn't look good." Green told Johnson, "It doesn't matter what it looks like. You've got to call the police now." Then, Johnson stated, "It looks bad. I'm scared." Green told Johnson that she was hanging up because she was going to call the police, but she suggested that Johnson call the police before she did.

The recording of Johnson's call to 9-1-1 was played for the jury. At approximately 8:08 a.m., he told the 9-1-1 operator, "Um, my girlfriend, uh, we had an argument, she tied a rope around her neck, tied it to my bumper, and I drove off, and I didn't know that she had done that, and now she's deceased." He also told the 9-1-1 operator, "She's in the pasture, and I would really like to go and cover her up before somebody gets there." Johnson expressed to the 9-1-1 operator his concern that the police show Craft's body respect when they arrived. Further, Johnson explained

> We were down at the creek bottoms, and we got in an argument, and I had a lariat because I was trying to get one of the calves up out of the bottom, and she tied it around her neck, and she was like "Oh yea, if you don't want to spend any time with me and if you just want to leave," and I was like, yea, whatever, and I just drove off. I didn't realize that she tied it to the bumper. So I dr[a]gged her for probably a good quarter mile. I walked out to the back of the truck to get my fishing pole to go fishing, and I was like, "Oh my God."

Johnson stated, "I had no idea or I wouldn't have drove and done the things I did, but I mean everybody can go out there and just look around, and the police do what they do; they'll see; they'll know what happened. I don't know why she did what she did, but obviously she was ready to go." Johnson did not know the address of Craft's house or his father's telephone number and address. He expressed a desire to commit suicide during the 9-1-1 call.

Meanwhile, according to David Bartlett, he awakened his wife and they looked up the telephone number for the Collin County Sheriff's Department. When David Bartlett called to report the matter, he was told it had already been reported.

According to Sgt. Mitchell Sellman of the Collin County Sheriff's Department, the deputies arrived at Craft's house at approximately 8:40 a.m. and detained Johnson. Sellman tried to locate Craft's body, but he was unsuccessful. So, Sellman said Johnson walked with deputies to the pasture, approximately one-half mile from the house, and Johnson showed them the location of Craft's body. The deputies found Craft's body lying face down in the grass with a rope still tied around her neck. Also, the police found a pair of women's panties, a pair of socks, a shotgun shell, and a cigarette near the area where the dragging appeared to begin. Johnson was very intoxicated, but eager to cooperate, and told Sellman that

> [He] and [Craft] had argued at one point in the vehicle out in the pasture. She had exited the vehicle. At some point she took off all her clothes, put the rope around her neck, he was ticked off and drove away and didn't know that she had tied herself to the bumper.

Sheriff's deputies took Johnson to the sheriff's department for further questioning by Sellman and Lt. A.P. Davidson of the Texas Rangers. Johnson was still intoxicated, his speech was slurred, and he was confused about the dates and times of events. During the interview, Johnson continued to assert that Craft and he were arguing, she put a rope around her neck, he drove away, and he felt bumps while driving. When asked about Craft putting the rope around her neck, Johnson stated,

> She was always doing that kind of stupid shit; she would punch holes in the walls at the house and throw shit around and just go nuts, and I'd be like damn girl, I'm too old for this; this is too much bullshit for me, I don't need this; you know I love you to death but I need my chill time . . . it's more than I can handle.

In response to questioning, Johnson stated that he did not get out of the truck in the pasture; the last time he saw Craft, she was standing behind his truck; he did not see her tie the rope to the

–4–

bumper, and "[he] had no idea she'd even done that." Johnson stated that he felt "negligent" because he did not take the rope away from her and that he was the responsible party because Craft had "snapped." Johnson also told the police that he referred to Craft as "Darla" when she behaved in an out of control fashion because it was like she was another person.

The police obtained a search warrant and took Johnson to the hospital for an alcohol concentration test. The test results showed that, approximately four and half hours after Johnson was taken into custody, his blood alcohol level was 0.22.

Collin County Medical Examiner William Rohr testified that Craft was found face down on the ground with her head turned to the right and a slip knot around and burrowed into her neck, similar to a "hanging type situation." It did not appear that an attempt had been made to remove the rope from Craft's neck or had moved the body. Craft's injuries indicated she had been dragged on her stomach, with her head turned to the right, and her palms facing up. The left side of her face took the brunt of the dragging, although she also suffered significant damage to her breasts, shoulder, and all along her abdomen over the left hip bone down to the knees.

Rohr testified he tested Craft's blood for any drugs or alcohol to see how they related to the cause and manner of death and that the toxicology results revealed Craft's blood alcohol was "quite high" at .25, roughly three times the legal limit. Rohr noted that Craft was 5'11" in height and weighed 105 pounds. Craft suffered from congenital hydrocephalus—the enlargement of the ventricles in the brain—but that it had nothing to do with her cause of death. He also said Craft had a history of bipolar disorder and a history of ovarian cancer. Rohr also stated that Craft had a small amount of Valium in her system, as well as a therapeutic amount of an anti-convulsant drug for her seizure disorder.

Rohr testified that, based on the investigation and his autopsy examination, Craft's cause of death was strangulation, having been dragged through a field with a lariat around her neck

–5–

attached to a trailer hitch of a pickup truck. He also determined that the manner of death was homicide.

Johnson was indicted for the offense of criminally negligent homicide. Johnson did not testify, but the audio recording of his 9-1-1 call and the video recording of his police interview were played for the jury. The jury found Johnson guilty, that he used a deadly weapon during the commission of criminally negligent homicide, and assessed his punishment at five and a half years of imprisonment.

## II. SUFFICIENCY OF THE EVIDENCE

In issues one, two, and three, Johnson argues the evidence is insufficient to support his conviction and the finding that he used or exhibited a deadly weapon during the commission of the offense, and therefore, the trial court erred in submitting the special issue.

### A. Standard of Review

When reviewing the sufficiency of the evidence, an appellate court considers all of the evidence in the light most favorable to the verdict to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.). Appellate courts are required to determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 902 n.19.

An appellate court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Jackson*, 443 U.S. at 319, 326; *Merritt*, 368 S.W.3d at 525; *Brooks*, 323 S.W.3d at 899. Juries are permitted to make reasonable inferences from the evidence at trial, and circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt.

–6–

*Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). Circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 15. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *Hooper*, 214 S.W.3d at 15. Juries are permitted to draw multiple reasonable inferences from the evidence, both direct and circumstantial, but they are not permitted to draw conclusions based on speculation. *Hooper*, 214 S.W.3d at 16.

An appellate court's duty is to ensure the evidence presented supports the jury's verdict and that the State has presented a legally sufficient case of the offense charged. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). All evidence, whether properly or improperly admitted, will be considered when reviewing the sufficiency of the evidence. *See McDaniel v. Brown*, 558 U.S. 120 (2010) (per curiam); *Lockhart v. Nelson*, 488 U.S. 33, 41–42 (1988); *Jackson*, 443 U.S. at 319.

### B. Criminally Negligent Homicide

In issue one, Johnson argues the evidence is insufficient to support his conviction. Johnson maintains that his conduct did not cause the death of Craft because the evidence shows that Craft committed suicide. In addition, Johnson argues there is no evidence of criminal negligence. Specifically, Johnson claims there was no evidence he knew that Craft had tied herself to the rear bumper of his truck. Also, Johnson argues that "any person, even a person intoxicated, would not anticipate anyone would tie themselves to a bumper with a rope around their neck, even if they had stated they intended to commit suicide."

The State responds that Johnson caused Craft's death. Also, the State contends Johnson "was aware of enough [attendant] circumstances that he ought to have perceived the substantial and unjustifiable risk of Craft's death" and that failure to perceive the risk constituted a gross deviation from the standard of care.

### 1. Applicable Law

Section 19.05(a) of the Texas Penal Code is titled "Criminally Negligent Homicide" and provides that "[a] person commits an offense if he causes the death of an individual by criminal negligence." TEX. PENAL CODE ANN. § 19.05(a) (West 2011). Section 6.03(d) of the Texas Penal Code defines the culpable mental state of criminal negligence as follows:

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(d) (West 2011). To make a legally sufficient showing of criminally negligent homicide, the state must prove: (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that there was a substantial and unjustifiable risk of death from his conduct; and (3) the defendant's failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. *Montgomery*, 369 S.W.3d at 192–93.

Criminal negligence requires that the actor ought to have been aware of a substantial and unjustifiable risk that his conduct could result in the type of harm that did occur. *Montgomery*, 369 S.W.3d at 193. The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all. *Montgomery*, 369 S.W.3d at 193; *Stadt*, 182 S.W.2d at 364; *Mitchell*, 321 S.W.3d at 36. The circumstances are viewed from the standpoint of the actor at the time the allegedly negligent act occurred. *Montgomery*, 369 S.W.3d at 193.

The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the

circumstances. *Stadt*, 182 S.W.2d at 364; *Mitchell*, 321 S.W.3d at 36. The seriousness of the negligence would be known by any reasonable person sharing the community's sense of right and wrong. *Montgomery*, 369 S.W.3d at 193. The degree of deviation from reasonable care is measured solely by the degree of negligence, not any element of actual awareness. *Montgomery*, 369 S.W.3d at 193. The question of whether the defendant's conduct was a gross deviation from the standard of care is a question to be answered by the fact-finder. *Montgomery*, 369 S.W.3d at 195.

## 2. Application of the Law to the Facts

Johnson argues that he did not cause Craft's death because she committed suicide. Johnson does not contest that he drove away with Craft roped by the neck to the bumper of his truck. Rather, he argues that his statement shows it was Craft's conduct of tying herself to the rear bumper of his truck that caused her death, not his act of driving away from her. Also, Johnson argues there is no evidence of criminal negligence or that he ought to have been aware his conduct of driving away could result in a substantial and unjustifiable risk of death to Craft absent his knowledge of her tying herself to the truck.

The indictment alleged that Johnson "cause[d] the death of an individual, Adana Craft, by operating a motor vehicle while dragging Adana Craft with a rope around her neck resulting in Adana Craft's death by strangulation." *See* TEX. CODE CRIM. PROC. ANN. art. 21.15. The application paragraph of the jury charge states "if you find from the evidence beyond a reasonable doubt that . . . Johnson, did then and there, by criminal negligence, cause the death of an individual, [] Craft, by operating a motor vehicle while dragging [] Craft with a rope around her neck, resulting in her death by strangulation." The charge included a definition of criminal negligence as follows:

> A person acts with "criminal negligence" or is "criminally negligent," with
> respect to the result of his conduct, when he ought to be aware of a substantial and

unjustifiable risk that the result will occur. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

On appeal, the State argues Johnson caused the death of Craft by "speeding away in a motor vehicle" and the fact that Craft may have tied herself to the bumper. As a result, the substantial and unjustifiable risk that Johnson ought to have been aware of was that Craft would die when he drove away from her.

The State points to the following evidence: (1) it was light outside; (2) Craft was always afraid Johnson would leave her; (3) she was angry and upset; (4) she was yelling and cursing; (5) she was intoxicated; (6) she had taken off her clothes; (7) she had put the lariat around her neck; (8) she said that she was going to kill herself; and (9) the last time Johnson saw her, she was behind his truck. Also, the State contends that Johnson's inconsistent statements, his untying the rope from his bumper and leaving Craft lying in the field, his phone calls to Bartlett and Green after the dragging, the delay in calling 9-1-1, and display of emotion demonstrate his consciousness of guilt and show he was hiding information.

The record shows the only testimonial evidence of the events that occurred before and during Craft's death are the audio recording of Johnson's 9-1-1 call and the video recording of his police interview. Although Johnson claimed Craft tied the other end of the lariat to the trailer hitch on his truck without him knowing that, the jury was free to believe some of his statements, and disbelieve others or all of his statements. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008).

Having reviewed the evidence, we conclude it is sufficient to support the jury's verdict that Johnson's act of driving away from Craft with a rope tied around her neck and attached to the bumper of the truck caused Craft's death and Johnson ought to have been aware that with Craft standing beside and then behind the truck with a rope around her neck, angry, intoxicated,

–10–

and threatening to kill herself, there was a substantial and unjustifiable risk that he would cause Craft's death when he drove away.

In addition, the jury believed his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. The jury could have believed, as the State claims, the evidence demonstrates Johnson "knew more than he was admitting—enough that his failure to perceive the risk of Craft's death constituted a gross, deviation from the standard of care." To support its argument, the State focuses on inconsistencies in Johnson's statements, his failure to inform the police that he called David Bartlett and conversation with Kathy Green, his delay in calling 9-1-1, and his desire to commit suicide. Further, the question of whether Johnson's conduct was a gross deviation from the standard of care is a question to be answered by the jury who clearly did not believe Johnson's version of the facts. *See Montgomery*, 369 S.W.3d at 195. Accordingly, we conclude the evidence is sufficient to establish Johnson's failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances.

We conclude the evidence is sufficient to establish Johnson committed criminally negligent homicide. Issue one is decided against Johnson.

### C. Deadly Weapon Finding and Special Issue

In his second and third issues, Johnson argues the evidence was insufficient to support the jury's finding that he used or exhibited a deadly weapon during the commission of the offense, and therefore, that the trial court erred in submitting the special issue. He argues that he did not use the truck as a deadly weapon because he did not realize that Craft had tied herself to the bumper. Johnson claims that a person would not anticipate that another person, even if she was suicidal, would tie herself to the bumper of a vehicle with a rope around her neck. Further,

–11–

he argues that when a person commits criminally negligent homicide through omission, there is the possibility that no deadly weapon was used. The State responds that the manner in which Johnson drove his truck made it capable of causing Craft's death or, in the alternative, the jury could have believed Johnson was aware or suspected that Craft had tied herself to his truck, causing the combination of the truck and rope to be a deadly weapon. In addition, the State argues Johnson was not charged with causing Craft's death from an omission, but through his acts.

Although Johnson provides case law addressing the use of a deadly weapon when criminally negligent homicide was committed through omission, he does not explain why he contends his offense was committed by omission. The indictment alleged that Johnson "cause[d] the death of an individual, [] Craft, by operating a motor vehicle while dragging [] Craft with a rope around her neck resulting in [] Craft's death by strangulation." We conclude the State did not allege that the offense was committed by omission.

A motor vehicle is not a deadly weapon per se. However, it may qualify as a deadly weapon through the presentation of evidence. *See, e.g., Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003) (automobile can be deadly weapon if driven so as to endanger lives). The medical examiner testified that Craft died from strangulation and that she was dragged. Johnson did not contest that he drove the truck or that Craft was tied to the rear bumper of the truck and that this caused her death. We have already concluded that the evidence was sufficient to establish the offense of criminally negligent homicide as charged. Accordingly, we conclude the evidence is sufficient to support the jury's finding that he used or exhibited a deadly weapon during the commission of the offense and, accordingly, no error resulted from the trial court's special issue to the jury.

## III. CONCLUSION

The evidence is sufficient to support Johnson's conviction and the deadly weapon finding. Also, we conclude no error resulted from the special issue on the use of a deadly weapon in the jury charge.

The trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

121506F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THERON WAYNE JOHNSON, Appellant

No. 05-12-01506-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas
Trial Court Cause No. 380-82005-2011.
Opinion delivered by Justice Lang. Justices Moseley and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 5th day of August, 2014.